IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

HAILE F. YANCY, PHD.          :

                             :

    v.                       :   Civil Action No. DKC 20-0276

                             :

XAVIER BECERRA,[1] IN HIS
OFFICIAL CAPACITY AS SECRETARY  :
OF THE DEPARTMENT OF
HEALTH AND HUMAN SERVICES     :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this employment case is a motion to dismiss or for summary judgment filed by Defendant, Xavier Becerra, Secretary of the United States Department of Health of and Human Services ("HHS" or the "Agency"). (ECF No. 11).   The issues have been fully briefed, and the court now rules, no hearing being deemed necessary.   Local Rule 105.6. For the reasons that follow, Defendant's motion will be granted.

## I.   Background

Plaintiff, Haile F. Yancy, is an African American research biologist in the Office of Research ("OR") within the Center for Veterinary Medicine ("CVM"), a division of the Food and Drug Administration ("FDA").   For most of the time relevant, Dr. Mary

---

[1] The complaint named Alex M. Azar II, former Secretary of Health and Human Services ("HHS") as Defendant.   (ECF No. 1). Xavier Becerra now serves as HHS Secretary.   Pursuant to Fed.R.Civ.P. 25(d), Secretary Becerra is automatically substituted as a party to this action.

Allen served as Plaintiff's direct supervisor, and Dr. John Graham served as Plaintiff's second-level supervisor.  Dr. Michael Myers became Plaintiff's first-level supervisor in early 2016.  During his twelve-year career at CVM, Plaintiff invented a DNA sequence used to create a "primer" that detects contaminants in animal feed. Plaintiff's OR lab would manufacture and provide the primers to several other labs within CVM's Office of Regulatory Affairs ("ORA"), which used the primers to conduct regulatory testing on commercial products.

During the relevant time period, Plaintiff was also involved in multiple research studies and technology transfer agreements ("TTAs").  TTAs allow FDA scientists to develop new technologies in collaboration with private industry partners.  Both sides may contribute funds, personnel, facilities, and equipment.  If the technology is then licensed by the private company for commercialization, the Agency is entitled to collect royalties, a portion of which go directly to the inventor.  There are two types of TTAs: Cooperative Research and Development Agreements ("CRADAs") and Research Collaboration Agreements ("RCAs"). Plaintiff had two open CRADAs in place with BioGX and InstantLabs and one draft CRADA with Qiagen not yet executed.  Despite FDA scientists' ability to license inventions with Agency approval, all such inventions belong to the government.

2

In November 2013, Dr. Graham became the OR Director and later implemented a series of reforms.  In September 2014, he instituted a policy requiring that all TTAs be connected to an approved research study.  He also began a department-wide "triage process" subjecting all research studies to review.  Multiple reviewers assessed the research studies for criteria designed to determine whether the studies remained relevant to OR's strategic mission and its current client needs.  If the study or a connected TTA failed to satisfy the criteria, it would be cancelled.

Plaintiff filed two prior Equal Employment Opportunity ("EEO") complaints on an undisclosed date presumably prior to November 2013.[2]  Both complaints were fully resolved by a settlement agreement dated September 18, 2015.

**A.   Review & Cancellation of CRADAs**

On October 20, 2015, Dr. Graham emailed Plaintiff requesting the study numbers related to his CRADAs.  On November 10, 2015, Dr. Graham informed the four OR scientists with open CRADAs or RCAs of the criteria that would be used to assess their TTAs.  It was ultimately determined that Plaintiff's CRADAs were not sufficiently relevant to OR's mission.  Dr. Graham made attempts

---

[2] Plaintiff does not provide the date he made either EEO complaint or attach copies of them.  He does, however, state that "Dr. Graham was informed of the existence of [the] complaint around the time he entered into the [Director] position in November 2013." (ECF No. 1-1, at 3).  This implies he made such complaints prior to November 2013.

to find other departments to house Plaintiff's CRADAs but was unsuccessful.   In April 2017, Plaintiff's BioGX and InstantLabs CRADAs were cancelled and his draft Qiagen CRADA was closed.   The other three scientists' agreements were reviewed but not cancelled.[3]   Plaintiff alleges that the Agency's new requirement that a CRADA be tied to a study was instituted by Dr. Graham to retaliate against him for his prior EEO activity.

**B.   Internal Disclosure of Primer Sequence**

In January 2016, Dr. Graham determined that it was not within OR's purview to provide primers to ORA for regulatory testing because ORA received funding to procure such materials and because the process OR was using to produce the materials was not subject to adequate quality control procedures.   Effective April 2016, Dr. Graham stated that OR would no longer produce the primers for ORA but would instead provide it with the primer sequence so that it could produce and pay for the materials itself.

**C.   Review & Cancellation of Plaintiff's Research Studies**

In September 2016, Plaintiff was notified that fourteen of his research studies would be cancelled for failure to meet the assessment criteria.   Plaintiff alleges that his studies were

---

[3] The race of the other scientists whose TTAs were reviewed is not stated.

4

cancelled in retaliation for his prior EEO activity.  In total, 100 out of 130 studies evaluated were terminated.[4]

**D.   Failure to Endorse for Promotion**

In order to receive a non-competitive promotion to the general schedule ("GS") 15 level, research scientists within CVM must undergo peer review.  Under this process, a candidate must submit a peer review package to his immediate supervisor for review and concurrence.  If the immediate supervisor does not concur, the candidate and supervisor attempt to discuss and resolve differences in the package.  If the differences cannot be resolved, the candidate may submit a self-nomination package without managerial support.

In February 2016, Plaintiff submitted a peer review package for promotion to GS-15 to Dr. Allen.  Dr. Allen reviewed the package and informed Plaintiff that she would not endorse it.  Plaintiff and Dr. Allen were scheduled to meet to discuss his package on April 7, 2016 but shortly after the meeting was scheduled to begin, Plaintiff cancelled at the advice of his attorney and the EEO office.  Plaintiff had instead initiated the peer review process by self-nomination on March 22, 2016.  Before the self-nomination package was processed, however, it was forwarded to Dr. Graham for endorsement as Plaintiff's second-

---

[4] The race of the other scientists whose research studies were cancelled is not stated.

level supervisor.  On April 26, 2016, Dr. Graham notified Plaintiff that he also would not endorse his package.  Plaintiff's self-nomination package was then forwarded to the Peer Review Committee for review.

At Plaintiff's request, a colleague served as the in-depth reviewer of his promotion package.  The colleague interviewed Plaintiff's first-level supervisor at the time, Dr. Myers, as part of her review.  A summary of her findings was presented at the Peer Review Committee meeting on July 11, 2016.  The Committee gave Plaintiff a score of 40 points, which falls within the range for a GS-14-level position (36 to 42 points).  The CVM HR Specialist for Plaintiff's review concurred with the appraisal. Plaintiff was notified in December 2016 that he was not promoted.

On March 1, 2016, Plaintiff initiated contact with an EEO counselor.  On April 28, 2016, Plaintiff filed a formal complaint of discrimination with the Agency's EEO office.[5]  Following investigation, discovery, and motions practice, an administrative judge dismissed Plaintiff's complaint on September 25, 2019.

On January 31, 2020, Plaintiff filed suit in this court alleging that he was discriminated against based on his race and

---

[5] Plaintiff, at his request, was detailed to Howard University as an assistant professor from April 2016 through April 2018 under an interagency personnel agreement.

color,[6] retaliated against, and thereby subjected to harassment
and a hostile work environment.  He bases these claims on five
events between October 2015 and December 2016 when the Agency:
(1) reviewed and cancelled his CRADAs in October and November 2015
(claims 2 and 3); (2) disclosed his primer sequence to the ORA in
January 2016 (claim 1); (3) reviewed and cancelled his research
studies in September 2016 (claim 4); and (4) declined to endorse
his package for promotion to GS-15 in December 2016 (claim 5).  On
January 19, 2021, Defendant filed a motion to dismiss, or in the
alternative, for summary judgment.[7]  (ECF No. 11).  Plaintiff
responded, (ECF No. 13), and Defendant replied, (ECF No. 14).

## II.  Hostile Work Environment Claim

### A.    Standard of Review – Motion to Dismiss

A motion to dismiss under Fed.R.Civ.P. 12(b)(6) tests the
sufficiency of the complaint.  *Presley v. City of Charlottesville*,
464 F.3d 480, 483 (4th Cir. 2006).  "[T]he district court must
accept as true all well-pleaded allegations and draw all reasonable
factual inferences in plaintiff's favor." *Mays v. Sprinkle*, 992

---

[6] Plaintiff checked the box for "color" but limited his claims
to race discrimination in the body of his complaint.

[7] Defendant styles its motion as one to dismiss, or in the
alternative, for summary judgment.  With respect to Plaintiff's
hostile work environment claim, it argues only for dismissal
pursuant to Fed.R.Civ.P. 12(b)(6).  The court will construe the
motion as a motion to dismiss with respect to Plaintiff's hostile
work environment claim and as a motion for summary judgment with
respect to Plaintiff's discrimination and retaliation claims.

F.3d 295, 299 (4th Cir. 2021).  A plaintiff's complaint need only satisfy the standard of Fed.R.Civ.P. 8(a)(2), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief[.]"  A Rule 8(a)(2) "showing" still requires more than "a blanket assertion[] of entitlement to relief," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 n.3 (2007), or "a formulaic recitation of the elements of a cause of action[.]" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that defendant is liable for the misconduct alleged." *Mays*, 992 F.3d at 299-300 (quoting *Iqbal*, 556 U.S. at 663).

**B.  Analysis**

To state a claim under Title VII for a hostile work environment, a plaintiff must allege that: "(1) [he] experienced unwelcome harassment; (2) the harassment was based on [his] gender, race, or age; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer." *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003).  While a plaintiff need not plead "specific facts establishing a prima facie case" at the motion to dismiss stage, *id*. at 764, a complaint must allege sufficient facts to state the elements of the claim.  *Id*. at 765.

Moreover, while "district courts must be especially solicitous of [*pro se*] civil rights plaintiffs," *Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir. 1978), the alleged facts must possess sufficient "heft" to push claims "across the line from conceivable to plausible," *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 256 (4th Cir. 2009). To determine whether the harassment was pervasive enough to render the work environment objectively abusive:

> the court looks to all the surrounding circumstances including "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating or a mere offensive utterance; and (4) whether it unreasonably interferes with [the] employee's work performance."

*Talley v. Farrell*, 156 F.Supp.2d 534, 541 (D.Md. 2001) (alteration in original) (quoting *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 242 (4th Cir. 2000) (citation omitted)).

In alleging his hostile work environment claim, Plaintiff relies on four events: the cancellation of his CRADAs, the cancellation of his research studies, the internal disclosure of his primer sequence, and the Agency's failure to promote him. Plaintiff alleges zero facts connecting any of these events to his race. Moreover, he alleges no hostile, abusive, or threatening language and no physical contact. Essentially, he alleges only that he received emails asking for or providing information and that he received a negative performance review. None of the

conduct alleged is offensive, humiliating, or threatening and utterly fails to rise to the level of severity or pervasiveness sufficient to render a work environment objectively abusive. "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Accordingly, Plaintiff's hostile work environment claim will be dismissed pursuant to Fed.R.Civ.P. 12(b)(6).

**III. Title VII Discrimination and Retaliation Claims**

    **A.    Standard of Review - Motion for Summary Judgment**

A motion for summary judgment will be granted only if there exists no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). A material fact is one that "might affect the outcome of the suit under the governing law[.]" *Liberty Lobby*, 477 U.S. at 248. A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see also EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005), but "a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences," *Chung Shin v. Shalala*, 166 F.Supp.2d 373, 375 (D.Md. 2001).

To prevail on a motion for summary judgment, the moving party generally bears the burden of showing that there is no genuine dispute as to any material fact.  No genuine dispute of material fact exists, however, if the nonmoving party fails to make a sufficient showing on an essential element of his case as to which he would have the burden of proof.  *Celotex*, 477 U.S. at 322–23. Therefore, on those issues on which the nonmoving party has the burden of proof, it is his responsibility to confront the summary judgment motion with an "affidavit or other evidentiary showing" demonstrating that there is a genuine issue for trial.  *See Ross v. Early*, 899 F.Supp.2d 415, 420 (D.Md. 2012), *aff'd*, 746 F.3d 546 (4th Cir. 2014).   Hearsay or conclusory statements with no evidentiary basis cannot support or defeat a motion for summary judgment.  *See Greensboro Pro. Fire Fighters Ass'n, Local 3157 v. City of Greensboro,* 64 F.3d 962, 967 (4th Cir. 1995).

**B.  Burden-Shifting Framework**

At the summary judgment stage, a plaintiff may establish a Title VII claim "either 'through direct and indirect evidence of

retaliatory [or discriminatory] animus,' or through a burden-shifting 'pretext' framework." *Netter v. Barnes*, 908 F.3d 932, 938 (4th Cir. 2018) (quoting *Foster v. Univ. of Md. E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015)). "Direct evidence encompasses conduct or statements that both (1) reflect directly the alleged discriminatory [or retaliatory] attitude, and (2) bear directly on the contested employment decision." *Laing v. FedEx Corp.*, 703 F.3d 713, 717 (4th Cir. 2013) (internal quotation marks and citation omitted). Thus, "[e]ven if there is a statement that reflects a discriminatory [or retaliatory] attitude, it must have a nexus with the adverse employment action." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006) (citing *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 608 (4th Cir. 1999)). "To survive summary judgment on the basis of direct and indirect evidence, [a plaintiff] must produce evidence that clearly indicates a discriminatory attitude at the workplace and must illustrate a nexus between that negative attitude and the employment action." *Brinkley*, 180 F.3d at 608 (citations omitted).

Where a Title VII plaintiff cannot proceed under a direct evidence theory, he must rely on the second avenue of proof: the pretext framework. In such cases, the plaintiff must first establish a *prima facie* case of discrimination or retaliation. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Waag v. Sotera Def. Sols., Inc.*, 857 F.3d 179, 191 (4th Cir. 2017).

If the plaintiff establishes a *prima facie* case, "a presumption of illegal discrimination arises, and the burden of production shifts to the employer" to produce evidence of a legitimate, non-discriminatory or retaliatory reason for its adverse employment action. *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011) (internal citation omitted); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). "If the defendant carries this burden of production," the plaintiff must then prove, by a preponderance of the evidence, "that the proffered reason was not the true reason," and that the plaintiff "has been the victim of intentional discrimination." *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 255-56 (1981); *see Reeves*, 530 U.S. at 143.

### C.    Analysis: Elements of Claims

Title VII prohibits discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1). Plaintiff appears to plead at least two forms of Title VII discrimination: (1) disparate treatment, and (2) failure to promote.

To establish a *prima facie* case of disparate treatment, the plaintiff must show "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman v. Md. Ct. of Appeals*, 626 F.3d

187, 190 (4th Cir. 2010) (citation omitted), *aff'd sub nom. Coleman v. Ct. of Appeals of Md.*, 566 U.S. 30 (2012). To establish a *prima facie* case for failure-to-promote, a plaintiff must show that "(1) [he] is a member of a protected group, (2) there was a specific position for which [he] applied, (3) [he] was qualified for that promotion, and (4) [his employer] rejected [the] application under circumstances that give rise to an inference of discrimination." *Williams v. Giant Food Inc.*, 370 F.3d 423, 430 (4th Cir. 2004) (citations omitted) (Section 1981 claim).

"An adverse employment action is a discriminatory act which adversely affects the terms, conditions, or benefits of the plaintiff's employment." *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004) (internal citation and quotations omitted). Thus, to be cognizable under Title VII, the adverse employment action must cause a "tangible" job consequence, such as discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion. *Boone v. Goldin*, 178 F.3d 253, 256 (4th Cir. 1999); *see Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998); *Vedula v. Azar*, No. 18-cv-0386-TDC, 2020 WL 5500279, at *7 (D.Md. Sept. 11, 2020) ("[T]angible employment action in most cases inflicts direct economic harm.")

Title VII also prohibits retaliating against an employee "because he has opposed any practice made an unlawful employment

practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).   To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show that: "(1) he engaged in a protected activity, (2) [his employer] acted adversely against him, and (3) the protected activity was causally connected to the adverse action." *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007).

"The antiretaliation provision [of Title VII] protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006).   Unlike for discrimination claims, a plaintiff need not establish an "ultimate employment decision" to make a *prima facie* case of retaliation. *Darveau v. Detecon, Inc.*, 515 F.3d 334, 341-42 (4th Cir. 2008).   Rather, he must show a materially adverse employment action, meaning that the "employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N.*, 548 U.S. at 57, 68-69 (describing this determination as an objective standard from the viewpoint of a reasonable employee).

Causation may be proved through two routes: (1) "the existence of facts that suggest that the adverse action occurred because of

15

the protected activity," and/or (2) "sufficient temporal proximity" between the protected activity and the adverse action. *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 123 (4th Cir. 2021) (citations and quotations omitted). Where a plaintiff relies solely on "mere temporal proximity to establish a causal connection between" her protected activity and the adverse action then "the temporal proximity must be very close." *Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007). However, "where temporal proximity between protected activity and allegedly retaliatory conduct is missing," a plaintiff may pursue the first route and point to "evidence of recurring retaliatory animus during the intervening period." *Id.* (citation and quotation omitted). This alone "can be sufficient to satisfy the element of causation." *Id.* On a motion for summary judgment, "very little evidence of a causal connection is required to establish a *prima facie* case of retaliation." *Roberts*, 998 F.3d at 127 (quoting *Burgess v. Bowen*, 466 F.App'x 272, 283 (4th Cir. 2012)). Ultimately, once an employer has offered a legitimate, non-retaliatory reason, a plaintiff must show "that retaliation was a but-for cause of a challenged adverse employment action." *Foster*, 787 F.3d at 252.

It is undisputed that Plaintiff engaged in protected activity prior to September 2015 when he filed two complaints with the EEO. It is undisputed that Plaintiff is a member of a protected class based on his race and that he filed an EEOC complaint, a protected

activity.   Defendant, however, challenges other aspects of Plaintiff's ability to support his claims.   This opinion analyzes Plaintiff's ability to present a *prima facie* case and rebut Defendant's legitimate, non-discriminatory reason for each claim.

### D.   Review & Cancellation of CRADAS (Claims 2 and 3)[8]

In claims 2 and 3 Plaintiff asserts that Defendant discriminated against him and retaliated by reviewing and cancelling his CRADAS.

### 1.   Discrimination *Prima Facie* Case

As to discrimination, Defendant argues that Plaintiff fails to demonstrate a *prima facie* case because the cancellation of Plaintiff's CRADAS is not an actionable "adverse employment action" under Title VII.   Defendant contends that the cancellations "had no impact on the terms or conditions of Plaintiff's employment."   (ECF No. 11-1, at 27).   Nor does it constitute a "'significant' change in his duties, responsibilities, or working conditions" because the decision did not impact Plaintiff's salary, he was not penalized for having the studies cancelled, and

---

[8] Claims 2 and 3 will be treated as a single claim as they pertain to the same central allegation that Plaintiff's CRADAS were reviewed and cancelled based on unlawful discrimination or retaliation.   While Defendant also makes the argument that claims 2 and 3 should be dismissed as untimely, "the face of the complaint [does not] clearly reveal[]" that the adverse action complained of occurred in October and November 2015, rather than in April 2017, and the claim will thus be addressed on its merits rather than on timeliness grounds.   *See Brooks v. City of Winston-Salem*, 85 F.3d 178, 181 (4th Cir. 1996).

he could submit a new research proposal for consideration at any point. (*Id.*). Plaintiff insists that the cancellation of his CRADAs *did* impact the terms and conditions of his employment and was one of the reasons he was not ultimately promoted.

In discussing whether the cancellations constitute an adverse action, the parties deal in depth with only one case, *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1557 (D.C. Cir. 1997), which is neither binding precedent nor factually on point because it dealt with an employer taking projects away from the plaintiff employee and assigning them to other employees. Here, the Agency simply cancelled Plaintiff's projects without ever reassigning them. Relevant caselaw from this district provides that typical adverse employment actions include "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion[.]" *Boone*, 178 F.3d at 255. Because Plaintiff's peer review evaluation expressly states that "projects have been cancelled because of lack of priority for OR and/or CVM," it appears that the cancellations were at least a factor in the decision not to promote Plaintiff. (ECF No. 11-3, at 158). The cancellations are thus sufficient to constitute an adverse action in this instance. The parties do not dispute whether Plaintiff has satisfied the remaining two elements necessary to show a *prima facie* case of discrimination, and instead jump to arguing about whether

18

Plaintiff has rebutted Defendant's legitimate, non-discriminatory reason for cancelling his CRADAs.

### 2.   Retaliation *Prima Facie* Case

Plaintiff's *prima facie* case for retaliation, however, is lacking.  This claim rests on two emails he received.  On October 20, 2015, Dr. Graham emailed Plaintiff requesting the study numbers connected to his CRADAS.  On November 10, 2015, Dr. Graham emailed all scientists in the OR, including Plaintiff, informing them that all existing TTAs (CRADAs and RCAs) would be reviewed based on four criteria and cancelled if they failed to meet such criteria.[9] Plaintiff does not provide the date on which "Dr. Graham determined that the BioGx, InstantLabs, and Qiagen CRADAS were not in CVM's 'swimlane,'" but notes that it was not until April 2017 that his CRADAS were actually cancelled.  (ECF No. 1-1, at 9).  Assuming that cancellation of Plaintiff's CRADAS constitutes an adverse action under the lower standard applicable in retaliation claims, such adverse action did not occur until April 2017.

As evidence of causation, Plaintiff states that Dr. Graham did not require that CRADAS be tied to a study until *after* he learned of Plaintiff's EEO settlement.  This is unpersuasive evidence of causation because Plaintiff alleges that "Dr. Graham

---

[9]  The criteria were as follows: "TTAs that are active, nonproductive, fall into the territory of another center/office, or are no longer needed by our CVM customers will be cancelled." (ECF No. 1-1, at 9).

was informed of the existence of Plaintiff's prior EEO complaint around the time that he entered into the [OR Director] position in November 2013." (ECF No. 1-1, at 3). Plaintiff's EEO complaint is likely his protected activity, not his settlement, and Dr. Graham purportedly learned of it at the same time he became Director of the office, i.e., the same time he gained the authority to, and did, implement many new policies. His emails to Plaintiffs were two years later and his cancellation of the CRADAs was even later still. Even if the settlement was protected activity, the CRADAs were cancelled in April 2017, approximately eighteen months after the Plaintiff's EEO settlement was reached. The temporal proximity of the events is too attenuated to create an inference of causation and save Plaintiff's *prima facie* case.

"[A] causal connection for purposes of demonstrating a prima facie case exists where the employer takes adverse employment action against an employee shortly after learning of the protected activity." *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004), *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)). Ordinarily, a one-year gap between the events cannot support a finding of causation absent other evidence. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (approving two cases that found three-month and four-month periods too far removed to be characterized as "very close"); *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003)

(finding that two months and two weeks separating the time between the protected activity and the adverse action was "sufficiently long so as to weaken significantly the inference of causation between the two events"). Without temporal proximity, there must be some other evidence of retaliatory animus between the protected activity and the allegedly retaliatory conduct. *Lettieri*, 478 F.3d at 650. Here, Plaintiff offers none and fails to make out a *prima facie* case of retaliation.

### 3.   Legitimate Non-Discriminatory Reason and Pretext

Even if Plaintiff had successfully demonstrated a *prima facie* case sufficient to advance him to the next stage of the *McDonnell Douglas* test for both discrimination and retaliation, Defendant has proffered a legitimate, non-discriminatory reason for cancelling Plaintiff's CRADAs. Defendant asserts that it cancelled the CRADAs as part of the office-wide triage process to advance the OR's strategic mission. Dr. Graham testified that this review was prompted by a desire to free up office resources including full-time employees, materials, and funds. (*See* ECF No. 11-7, at 24). As Director, Dr. Graham was concerned that OR "had several RCAs/CRADAs that may potentially be creeping into [ORA's] territory." (ECF No. 11-3, at 64-65). He felt that:

> [m]anagement has the right to perform a triage
> of its research portfolio and to assign or
> reassign work to employees. OR is not
> academia; [scientists] can't work on whatever
> project they feel like working on for as long

> as they wish to work on them.   We conduct
> mostly applied research to support regulatory
> decision making, and the work must remain
> strategically important, productive, customer
> supported, and be conducted in a timely manner
> to receive continued support from management.

(*Id.*, at 17).   The triage applied to all OR scientists, was conducted at the same time, and utilized the same criteria: any agreements that were "inactive, nonproductive, fall into the category of another center/office[,] or are no longer needed by our CVM customers" would be cancelled.   (ECF No. 1-1, at 9).

Defendant states, and the record shows, that Plaintiff's CRADAs (with BioGX, InstantLabs, and Qiagen) were cancelled because they did not meet these criteria.   Specifically, the InstantLabs CRADA was cancelled because the topic focused on catfish and was no longer relevant to the FDA because responsibility for regulating catfish had been transferred to the Department of Agriculture.   (ECF No. 13-3, at 274).   The BioGX CRADA was cancelled because it was completed and determined that, even if it were transferred, there was nothing more that ORA could do under it since a commercial assay had been developed and validated.   (ECF No. 11-3, at 69).

Plaintiff's attempts to show that Defendant's proffered reason is false are unavailing.   (*See* ECF No. 13, at 23-25).   Plaintiff responds that discrimination is "evident when comparing the treatment of . . . Dr. Alberto Chiesa [who] was the only

22

similarly situated employee who had technology transfer agreements in place at the time, other than Plaintiff." (*Id.*, at 24). This is not so. The record shows that Dr. Chiesa also had his agreements reviewed. The same clear and objective criteria were applied for evaluating all agreements. Although Dr. Chiesa's agreement was not ultimately cancelled like Plaintiff's was, Plaintiff has neither stated nor shown that Dr. Chiesa was outside his protected class, based either on race or protected activity. Thus, contrary to Plaintiff's contention, no inference of discrimination or retaliation can be drawn from this comparator.

Plaintiff also points to several stray remarks in various employees' depositions which he claims show that Defendant's proffered reason lacks credibility. (ECF No. 13, at 24-25). For example, Plaintiff argues that Dr. Graham lied because he said the primary driver of the cancellations was the Scientific Advisory Group ("SAG"), but individual members of the SAG testified that they had little recollection of making the decision to cancel CRADAs. A more careful review of the record shows that Dr. Graham actually stated that multiple members of multiple departments weighed in on the decision to triage and cancel CRADAs, including but not limited to the SAG. Dr. Graham also does not deny that he was the ultimate decision maker as Director and therefore, the remarks Plaintiff emphasizes fail to generate an inference of discrimination. The record also shows that Dr. Graham attempted

23

to find other departments to take over Plaintiff's CRADAs before canceling them although none were ultimately willing to take-in the agreements. (*See* ECF No. 11-3, at 66, 77-84, 95-98).  Such evidence further undercuts any theory that Dr. Graham was motivated by discriminatory intent.[10]

Because Plaintiff has failed to produce evidence capable of rebutting Defendant's legitimate, non-discriminatory reason for cancelling his CRADAs, Defendant is entitled to judgment on any discrimination or retaliation claim arising out of this event.

### E.  Review & Cancellation of Studies (Claim 4)

In claim 4, Plaintiff contends that Defendant unlawfully discriminated against him based on his race and retaliated against him when it reviewed and cancelled his research studies in September 2016.

### 1.  Discrimination *Prima Facie* Case

The same questions as above around whether this may be considered an adverse employment action apply here.  Even assuming that cancelling Plaintiff's studies is an adverse action, however, Plaintiff still fails to demonstrate a *prima facie* case of

---

[10] Plaintiff also argues that the cancellation of his CRADAs violated the 2015 settlement agreement which he asserts "required CVM to continue to assist [his] efforts in securing CRADAs and submitting technology for licensing considerations for the PCR assays for BioGX, InstantLabs, and Qiagen." (ECF No. 13, at 23 n.3).  The terms of the settlement agreement have not been provided.  Any relief for breach of the settlement agreement should be sought elsewhere.

discrimination because he fails to show that he was treated differently than anyone else.  To the contrary, the record shows that all researchers had their studies evaluated during the triage. Furthermore, many other researchers had their studies cancelled, and multiple other researchers had *all* of their research studies cancelled.  Plaintiff contends that he was treated differently than researchers who had all their studies cancelled because many of them received promotions.  Plaintiff, however, fails to plead or prove that these individuals were outside his protected class. This is fatal to his *prima facie* discrimination case.

**2.    Retaliation *Prima Facie* Case**

As with the discrimination claim, Defendant argues Plaintiff fails to make out a *prima facie* case of retaliation because the cancellation of studies is not an adverse employment action and Plaintiff fails to show causation between his protected activity and the cancellation of his studies.  Plaintiff has established a sufficiently adverse action to meet the lower retaliation standard.  As noted before, a plaintiff claiming retaliation need not demonstrate that his employer took an "adverse employment action," as required for discrimination claims.  He must instead establish only that the employer's actions were materially adverse because they might "well dissuade a reasonable worker from making or supporting a charge of discrimination."  *Burlington N.*, 548 U.S. at 57.   Certainly, cancellation of *all* of a research

scientist's years-long studies might dissuade an employee from making complaints and can constitute a materially adverse action for retaliation.

Plaintiff's claim still fails, however, because he does not provide sufficient evidence of a causal link between his protected activities in September 2015 (at the very latest) and the Agency's decision to terminate his studies in September 2016.  Plaintiff baldly concludes, without support, that the decision to cancel his studies was "infested with discriminatory and anti-retaliatory motives."  (ECF No. 13, at 19).  To the contrary, the record demonstrates that all scientists within the OR had their studies reviewed as part of the triage and 100 out of the 130 evaluated were slated for termination.  Without anything more, the temporal proximity between the events is insufficient to establish a causal connection.  *See Westmoreland v. Prince George's Cnty.*, No. 09-cv-2453-AW, 2010 WL 3369169, at *10 (D.Md. Aug. 23, 2012) ("Although there is no bright-line rule on the issue of temporal proximity, the Fourth Circuit has held that a lapse of over three months between the protected activity and the alleged retaliation is too long to give rise to an inference of causality.").  Thus, Plaintiff fails to make out a *prima facie* case of retaliation in Claim 4.

### 3.   Legitimate Non-Discriminatory Reason and Pretext

Dr. Graham testified that "[t]here were a significant number of open studies that could not possibly all be executed in a timely manner.  It was my objective, as the new Office Director, to focus our research portfolio on *productive* studies that addressed *current* customer needs[.]"  (ECF No. 11-3, at 33) (emphasis in original).  The burden shifts back to Plaintiff to provide evidence that this reason is false, and that discrimination or retaliation was the real reason for cancelling his studies.

Plaintiff contends that the Agency's stated reason for cancelling his research studies is pretext because he "was one of very few employees who had all of his research studies cancelled." (ECF No. 13, at 21).  Defendant states that Plaintiff was one of nine individuals who had all of their research studies terminated and that 100 out of 130 evaluated studies were terminated.  (ECF No. 11-3, at 33-34).  Plaintiff responds that this data is not meaningful because four of the eight other scientists who had all of their research studies cancelled were moved into management positions.  (ECF No. 13, at 22).  Plaintiff's reference to comparators is futile as to his discrimination claim because he neither pleads nor proves that they were outside his protected class.  As to retaliation, Plaintiff states that another two scientists also engaged in prior protected EEO activity and had all of their studies cancelled because they were also being

retaliated against.  (*Id.*).  Even if three of the nine scientists who had all studies cancelled had engaged in protected activity, the other six who had not engaged in protected activity still had all their studies cancelled.

He also states that the department-wide triage process is pretext for discrimination because his research studies were "targeted" for cancellation before the triage process even began. (ECF No. 13, at 21).  The email Plaintiff identifies came to him from an employee named Shannon Jordre on April 27, 2015 stating, "As I understand it, David Heller (who I don't know) has recommended that these studies be terminated based on age, lack of activity, and other criteria – and we have been asked to concur." (ECF No. 13-3, at 334).  Aside from the fact that this email is hearsay, it refutes any inference of pretext and instead shows that Plaintiff's studies were evaluated for the reason the Agency stated – to dispense with older projects no longer relevant to current client needs.  And, as with the CRADA cancellation, the fact that Dr. Graham made the final decision to cancel the research studies does not contradict his testimony or show pretext because he never stated that SAG drove the decision.  He acknowledged that he made the decision and merely stated that other colleagues were also involved in the process.

Because Plaintiff has not shown that the Agency's reasons were false, or that they were pretext, any discrimination or

28

retaliation claims arising from his research studies fail and Defendant is entitled to judgment.

**F.   Internal Disclosure of Primer Sequence (Claim 1)**

In claim 1, Plaintiff argues that Defendant discriminated and retaliated against him by disclosing to the ORA his primer sequence, thereby eliminating any possible opportunity he may have had to generate income by licensing the sequence.

**1.   Discrimination *Prima Facie* Case**

Defendant argues that it is entitled to summary judgment on this claim because its disclosure of the primer sequence does not constitute an adverse employment action under Title VII for two reasons. First, it contends that Plaintiff has not demonstrated that the disclosure of the primer sequence to an internal department impacted his ability to profit from commercial licensing of the primer. Even if he had demonstrated this, Defendant argues that:

> [the] mere speculation that he may suffer some financial loss due to a possible lost opportunity is insufficient as a matter of law to state a claim. As liability will not normally attach to "interlocutory or mediate decisions having no immediate effect upon employment conditions." *Page v. Bolger*, 645 F.2d 227, 233 (4th Cir. 1981) (en banc), *cert. denied*, 454 U.S. 892 (1981).

(ECF No. 11-1, at 27).

Plaintiff contends:

> The companies in the CRADA could have commercialized the primers and they would have been required to pay for the rights to use the primers. . . .

29

> By having the sequences, the ORA labs no longer had the need to order the primers from another source.   In addition, there was no reason that any company would enter into a licensing agreement to develop commercialized kits knowing the biggest customer had free access to the primers.   By removing the incentive to commercialize the IP, i.e., the primers, the companies will not develop commercial kits.

(ECF No. 13, at 18).

In rebuttal, Defendant points to a statement in an email from Dr. Graham summarizing statements by Alice Welch, the Director of the Technology Transfer Program, that giving the primer sequences to ORA for internal government use would not put Plaintiff's IP at stake.   (ECF No. 1-1, at 10) ("Sequences are government property and are to be given to ORA.   If IP is involved, NDAs should be set up with any contractor who produces reagents for ORA, per Alice Welsh.   Thus, neither IP nor potential licensing agreements will be affected.").

The parties rely solely on their own conflicting statements and there is a genuine dispute of material fact as to whether the internal disclosure impacted Plaintiff's ability to license the sequence.   It is possible that Plaintiff's decrease in pay could constitute an adverse employment action.

The last question remaining, then, in determining whether Plaintiff has made a *prima facie* case of discrimination, is whether he has shown that similarly situated individuals outside of his protected class were treated differently than he was or whether

there is some other circumstance showing discrimination.  He has not.  Plaintiff's claim thus fails at the first stage of the *McDonnell Douglas* test.

### 2.   Retaliation *Prima Facie* Case

While there is a genuine dispute of material fact as to whether the disclosure eliminated the opportunity for Plaintiff to generate income by licensing the primers, the disclosure itself could constitute an adverse action under the retaliation standard even if it did not, in fact, foreclose Plaintiff's ability to profit off the royalties.

Nonetheless, Plaintiff's *prima facie* case still fails on the causation prong.  Dr. Yancy neither pleads nor proves any facts that would allow one to infer that his protected activity was the cause of the disclosure.  To show causation, Plaintiff relies on the fact that for the previous seven years, Dr. Graham and the CVM agreed to provide the ORA with the physical primers rather than disclose the primer sequence.  The fact that the Agency changed course, alone, is not enough to establish causation, particularly in light of the fact that Dr. Graham had recently become Director and implemented several reforms.  In fact, Dr. Graham specifically testified to the fact that he viewed things differently than his predecessor.  (*See* ECF No. 11-7, at 39) ("[T]he primary driver was it is not in [OR's] field to be providing reagents to ORA.  That might have been my predecessor's point of view.  That's not my

31

point of view.  I saw risks there and that's what I'm paid to do is look for risks and mitigate them.").

Without any specific facts suggesting causation, Plaintiff must rely on temporal proximity alone to show causation.  Here, however, the events are too attenuated to show causation. Plaintiff engaged in protected activity in September 2015 at the latest.  The decision to disclose the primer sequence was made five months later in January 2016.  *See Westmoreland*, 2010 WL 3369169, at *10.

### 3.    Legitimate Non-Discriminatory Reason and Pretext

Assuming *arguendo*, that Plaintiff had demonstrated a *prima facie* case, his claims would still fail.  Defendant has clearly articulated a legitimate, non-discriminatory reason for disclosing the primer sequence. Dr. Graham testified that he decided to disclose the primer sequence internally to the ORA for two reasons. First, because the CVM provides the ORA with funding for buying their own materials, Dr. Graham believed that the OR was acting outside its bounds and wasting its own resources to produce the physical primers for the ORA.  (*See* ECF No. 11-7, at 29, 33) ("It's not in our swim lane to be providing reagents for regulatory testing to ORA. . . . CVM gives them money to do that.  They should be buying their own stuff. . . . [W]e are not in the business of providing reagents to ORA, especially when [CVM] give[s] ORA several million dollars every year to do work for CVM.").  The

second proffered reason for disclosing the sequence was because OR could not guarantee the quality of the primers because their production process, which required aliquoting[11] and diluting chemical substances, was not being overseen by any quality assurance process.  To ensure quality, Dr. Graham testified, the ORA needed to be producing the primers itself and under precise quality control procedures.  (*Id.*, at 30, 37-39).

In response to Defendant's proffered reasons, Plaintiff asserts that the project fell *within* the scope of OR's strategic mission and that the primers *were* being produced under quality control.  He offers no evidence to prove either of these assertions other than his own speculation.  Plaintiff further contends that these reasons constituted a change in the Agency's thinking but that alone is not evidence that such reasoning was false.

Plaintiff also argues that Dr. Graham gave false testimony when he stated Dr. Myers did not provide him information on whether the primers were produced under quality control.  Plaintiff contends that Dr. Myers did provide Dr. Graham with information on quality control compliance.  This argument overlooks Dr. Graham's testimony, which was that, regardless of whether the primers were manufactured in a compliant manner, once they got to Dr. Yancy's lab, further manipulation was done.  Such manipulation needed to

---

[11] Aliquoting is the process of separating a chemical substance.

be, but was not, done under quality control procedures. Thus, whether Dr. Myers provided Dr. Graham information is of no import and does not undercut Dr. Graham's reasoning.

Because Plaintiff has provided no evidence of racial animus in the Agency's decision, there is no circumstantial evidence that would support a finding of pretext. Plaintiff lacks any evidence tending to show that Defendant's stated reasons are false and falls even further short of showing that unlawful retaliation was the real reason. Accordingly, any claims for discrimination or retaliation related to the Agency's internal disclosure of the primer sequence fail and Defendant is entitled to judgment.

### G.   Failure to Endorse for Promotion (Claim 5)

In claim 5, Plaintiff alleges that Defendant both discriminated and retaliated against him by interfering with his application for promotion to GS-15. Specifically, he states that his supervisors—Drs. Allen and Graham—declined to support his promotion (on March 1, 2016 and April 21, 2016, respectively) and that although he was still able to self-nominate for the promotion, their lack of support was critical to the denial of his promotion in December 2016.

#### 1.   Discrimination *Prima Facie* Case

Plaintiff fails to show a *prima facie* case for failure-to-promote because he does not provide any evidence establishing that he was qualified for the promotion or that the Agency rejected his

application under circumstances that give rise to an inference of discrimination.

The record makes clear that the Peer Review Committee evaluated Plaintiff's application and appraised his research accomplishments at a total of 40 points. This score fell below the minimum 43 points necessary to qualify for promotion to the GS-15 level. The Committee supported its decision with pages of written findings. (ECF No. 11-3, at 152-159; *see id.*, at 158) ("The Committee was also concerned by the lack of recent accomplishments by Dr. Yancy. Much of the supporting documentation provided to the Committee related to research conducted prior to Dr. Yancy's promotion in 2011. . . . Dr. Yancy needs to focus his efforts on aligning his research program with the needs and objectives of CVM. . . . It is critical that Dr. Yancy communicate and develop his plans with appropriate management to ensure alignment with CVM research needs."). The Agency's Human Resources Position Classification Specialist also concurred with the Committee's appraisal. (ECF No. 11-3, at 159).

Even if Plaintiff had established that he was qualified for the promotion, he points to zero circumstances giving rise to an inference of discrimination. *See Williams v. Giant Food Inc*., 370 F.3d 423, 430 (4th Cir. 2004). Plaintiff contends that discrimination can be inferred because the Agency did not follow the standard operating procedure for conducting his peer review

process, because his supervisors were not interviewed.   This is somewhat contradicted by the record which shows that Plaintiff's first-level supervisor at the time his promotion package was reviewed, Dr. Myers, was interviewed.[12]   In addition, Dr. Allen, who had most recently served as Plaintiff's first-line supervisor, informed him of her decision not to support his promotion. Plaintiff was scheduled to meet with Dr. Allen to discuss her decision on April 7, 2016 but decided to self-nominate instead and cancelled the meeting.   Thus, to the extent that standard operating procedures were not followed, it was due at least in part to Plaintiff's actions.

Plaintiff also takes issue with the duration of the look-back period evaluated.   Confusingly, he simultaneously argues that the Committee reviewed a period that was too "limited" because it focused only on Plaintiff's accomplishments in the two preceding years (2015 and 2016) and that the review was too broad.   (ECF No. 13, at 28) ("One of the primary issues was that much of the material in the package was dated prior to Plaintiff receiving his GS-14 promotion. There was very little in the package regarding

---

[12] The summary of the report presented to the Peer Review Committee indicated that Dr. Myers was interviewed as "acting supervisor." (ECF No. 11-3, at 136). Dr. Myers indicated in his deposition that he was interviewed only as a colleague. (ECF No. 13-3, at 67-71).

recent activity in the last few years . . . . There was very little evidence of any current research activity.").

It is unclear what Plaintiff's actual contention is here, but he states that such "improprieties exemplify the disparate treatment to which [he] was subjected as compared to similarly situated employees who also went through the peer review process for GS-15 promotion," which he asserts includes Drs. Alberto Chiesa, Pak-Sin Chu, Beilei Ge, and Hiranthi Jayasuriya. (ECF No. 13, at 29). "[T]o draw an apt comparison, the plaintiff must demonstrate that all relevant aspects of his employment situation were 'nearly identical' to those of the other employees." *Dudley v. Wash. Metro. Area Transit Auth.*, 924 F.Supp.2d 141, 161 (D.D.C. 2013) (citing *Royall v. Nat'l Ass'n of Letter Carriers*, 548 F.3d 137, 145 (D.C. Cir. 2008)). Again, Plaintiff fails to plead or prove that any of these individuals are similarly situated or outside his protected class and this is fatal to any discrimination claim for failure-to-promote.

### 2. Retaliation *Prima Facie* Case

Withholding managerial support for a subordinate's promotion could dissuade a reasonable employee from complaining of discrimination and constitutes an adverse action for retaliation purposes. Plaintiff, however, fails to make out a *prima facie* case of retaliation because he has not asserted any facts demonstrating a causal link between his EEO activity and his

failure to be promoted (or the withholding of managerial support). He merely asserts a litany of disagreements with his peer reviewers concerning the extent of his accomplishments as a research scientist. (*See* ECF No. 13, at 27-31).  He also cannot rely on a theory of temporal proximity to prove causation because the adverse action occurred, at the very minimum, more than six months after he engaged in protected activity.  Standing alone, six months is not "very close." *See Penley v. McDowell Cnty. Bd. of Educ.*, 876 F.3d 646, 656 (4th Cir. 2017) ("Where a plaintiff rests his case on temporal proximity alone, the temporal proximity must be very close.").

### 3. Legitimate Non-Discriminatory Reason and Pretext

Even if Plaintiff had made out a *prima facie* case of discrimination or retaliation, his claims would still fail because Defendant has proffered a legitimate, non-discriminatory reason for declining to promote him, namely, that he was not qualified, and Plaintiff has not offered any evidence capable of rebutting this reason.

The record demonstrates that Plaintiff was not promoted to GS-15 because he failed to meet the criteria for the position.  To be promoted to GS-15, Plaintiff had to receive 43 or more points in his peer review appraisal.  (*See* ECF No. 11-3, at 159). Plaintiff scored only 40 points, placing him in the GS-14 range.

The Committee supported its finding that Plaintiff was not qualified on several grounds:

> The Committee determined that Dr. Yancy's expertise in molecular methods and species identification has not expanded.  It was also determined that, while Dr. Yancy has expertise in certain other scientific areas . . . his demonstrated accomplishments to date do not support a recommendation for promotion to the GS-15 level as a Research Biologist.
>
> The Committee concluded that Dr. Yancy's submitted package did not reflect research assignments and accomplishments, supervisory controls, originality of work, his qualifications, impact on research, and scientific contributions -- the factors used for evaluation of research scientists -- to warrant recommendation of his promotion to the GS-15 level at this time.
>
> [] Dr. Yancy did not provide evidence that he is bringing novel science to address the strategic goals of the Center as recommended two years ago. . . . [T]he review package did not demonstrate the significant level of impact required for promotion, nor exhibit the exceptional leadership and attainment expected of a GS-15 level Research Biologist.

(ECF No. 11-3, at 156).

Plaintiff offers no evidence to counter the Committee's stated findings.  Accordingly, Defendant is entitled to summary judgment as to any discriminatory failure to promote or retaliation claims arising out of the failure to endorse Plaintiff for promotion, or from the decision not to promote Plaintiff.

**IV.  Conclusion**

For the foregoing reasons, the motion to dismiss filed by Defendant as to Plaintiff's hostile work environment will be granted.  The motion for summary judgment filed by Defendant as to Plaintiff's discrimination and retaliation claims will also be granted.  A separate order will follow.

/s/
_____
DEBORAH K. CHASANOW
United States District Judge
